# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WAYMAN PATTERSON, JR.,

       Petitioner,

    v.

GREGG McQUIGGIN,

       Respondent.

_____/

CASE NO. 2:06-CV-15672
JUDGE GERALD E. ROSEN
MAGISTRATE JUDGE PAUL J. KOMIVES

## REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION ................................................................ 2
II.   REPORT ........................................................................ 2
    A.   *Procedural History* ...................................................... 2
    B.   *Factual Background Underlying Petitioner's Conviction* ................... 6
    C.   *Procedural Default* ..................................................... 10
    D.   *Standard of Review* ..................................................... 11
    E.   *Sufficiency of the Evidence (Claims I & II)* ............................ 13
        1.   *Clearly Established Law* ........................................ 13
        2.   *Analysis* ...................................................... 14
            a.  Involuntary Manslaughter ..................................... 14
            b.  Assault ...................................................... 20
    F.   *Prosecutorial Misconduct (Claim III)* ................................... 22
        1.   *Clearly Established Law* ........................................ 22
        2.   *Analysis* ...................................................... 23
            a.  Evidence of the Victim's Character ........................... 23
            b.  Expert Witness Testimony ..................................... 24
            c.  Disparaging Defense Counsel, Witnesses, and Petitioner ....... 24
    G.   *Evidentiary Claims (Claims IV-VI)* ...................................... 28
        1.   *Clearly Established Law* ........................................ 29
        2.   *Analysis* ...................................................... 30
            a.  Video Evidence (Claim IV) .................................... 30
            b.  Defense Investigator (Claim V) ............................... 39
            c.  Character Evidence of Victim (Claim VI) ...................... 40
    H.   *Judicial Bias (Claim IV)* ............................................... 43
        1.   *Clearly Established Law* ........................................ 43
        2.   *Analysis* ...................................................... 45
    I.   *Ineffective Assistance of Counsel* ...................................... 46
    J.   *Conclusion* ............................................................. 48
III.  NOTICE TO PARTIES REGARDING OBJECTIONS ...................................... 48

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Wayman Patterson, Jr., is a state prisoner, currently confined at the Baraga Maximum Correctional Facility in Baraga, Michigan.

2.      On December 19, 2001, petitioner was convicted of one count of involuntary manslaughter, MICH. COMP. LAWS § 750.321(c); and two counts of assault with a dangerous weapon, MICH. COMP. LAWS § 750.82, following a jury trial in the Macomb County Circuit Court.[1]  On January 29, 2002, he was sentenced to a term of 71 months' to 15 years' imprisonment on the involuntary manslaughter conviction, and to concurrent terms of 31-48 months' imprisonment on the assault convictions.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      CONTINUOUS AND PERVASIVE PROSECUTORIAL MISCONDUCT THROUGHOUT THE ENTIRE PROCEEDINGS DENIED MR. PATTERSON HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL.

II.     JUDICIAL MISCONDUCT IN THE FORM OF REPEATED CRITICISMS OF DEFENSE COUNSEL, COMMENTARY IN FRONT OF THE JURY ON THE AMOUNT OF MONEY THE TRIAL WAS COSTING THE COUNTY AT THE INDIGENT DEFENDANT'S EXPENSE, AND SPECIFIC PRAISES OF THE PROSECUTOR AND THE PROSECUTOR'S WITNESSES DENIED MR. PATTERSON HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL.

---

[1]Petitioner was tried on charges of second degree murder and assault with intent to do great bodily harm less than murder.  He was convicted on the lesser offenses of involuntary manslaughter and assault with a deadly weapon.

III.    MR. PATTERSON WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE BY THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY (A) AS TO THE VICTIM'S CONTRIBUTORY NEGLIGENCE AS A FACTOR TO CONSIDER IN ASSESSING DEFENDANT'S GUILT OF THE MURDER CHARGE AND (B) AS TO THE DEFENSE THEORY OF ACCIDENT IN DEFENSE OF THE ASSAULT CHARGES.

IV.     THERE WAS INSUFFICIENT EVIDENCE TO CONVICT MR. PATTERSON OF INVOLUNTARY MANSLAUGHTER WHEN THE PROOFS AT TRIAL REVEALED, AT MOST, ONLY EVIDENCE OF NEGLIGENT HOMICIDE, IF ANY CRIME AT ALL.

V.      THERE WAS INSUFFICIENT EVIDENCE TO CONVICT MR. PATTERSON OF TWO COUNTS OF FELONIOUS ASSAULT WHERE THE PROOFS AT TRIAL CLEARLY SUPPORTED A CLAIM OF ACCIDENT AND/OR DEFENSE OF OTHERS.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Patterson*, No. 239702, 2003 WL 22160441 (Mich. Ct. App. Sept. 18, 2003) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. Petitioner asserted two additional claims: ineffective assistance of appellate counsel and suppression of exculpatory evidence. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Patterson*, 469 Mich. 1017, 676 N.W.2d 630 (2004).

5.      Subsequently, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims: insufficient evidence; improper exclusion of prior bad acts evidence relating to the victim; and ineffective assistance of appellate counsel. The trial court denied the motion on June 29, 2005, concluding that petitioner's insufficient evidence claims were decided against him on direct appeal and thus barred by MICH. CT. R. 6.508(D)(2); that petitioner's bad acts evidence claim could have been raised on direct appeal and

petitioner did not establish good cause for his failure to do so, barring the claim pursuant to MICH. CT.

R. 6.508(D)(3); and that petitioner's ineffective assistance of appellate counsel claim was without

merit. Petitioner sought leave to appeal this determination, raising the following claims:

> I. THE TRIAL COURT ABUSED ITS DISCRETION BY SUPPRESSING MATERIAL AND IMPEACHMENT EVIDENCE FAVORABLE TO THE DEFENDANT EITHER TO GUILT OR PUNISHMENT WHICH DENIED THE DEFENDANT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL.

> II. THE TRIAL COURT ABUSED ITS DISCRETION BY PRECLUDING THE DEFENDANT FROM PRESENTING HIS INVESTIGATOR (JOHN D. GIFFORD) TO TESTIFY ON BEHALF OF THE DEFENDANT TO REBUT THE PROSECUTION'S WITNESSES ABOUT VIDEO EVIDENCE THAT WAS INTRODUCED AT TRIAL WHICH DENIED THE DEFENDANT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL

> III. THE TRIAL COURT ABUSED ITS DISCRETION BY PRECLUDING THE DEFENDANT FROM INTRODUCING CHARACTER EVIDENCE OF THE VICTIM TO BE USED AS A DEFENSE OF PROVOCATION AND TO SHOW A SCHEME, PLAN, SYSTEM UNDER MRE 404(b).

> IV. DEFENDANT RECEIVED DEFICIENT AND INADEQUATE REPRESENTATION ON HIS APPEAL OF RIGHT BY HIS APPELLATE COUNSEL THUS DENYING HIM HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for

leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing

entitlement to relief under MCR 6.508(D)." *People v. Patterson*, 477 Mich. 948, 723 N.W.2d 868

(2006); *People v. Patterson*, No. 268153 (Mich. Ct. App. Aug. 2, 2006).

> 6. Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on December 21, 2006. As grounds for the writ of habeas corpus, he raises seven claims:

> I. INSUFFICIENT EVIDENCE TO CONVICT OF INVOLUNTARY MANSLAUGHTER.

4

II. INSUFFICIENT EVIDENCE TO CONVICT OF TWO COUNTS OF FELONIOUS ASSAULT WITH A DANGEROUS WEAPON.

III. CONTINUOUS AND PERVASIVE PROSECUTORIAL MISCONDUCT THROUGHOUT THE ENTIRE PROCEEDINGS.

   A. THE PROSECUTOR IMPROPERLY SET FORTH IN HIS CASE IN CHIEF EVIDENCE OF THE VICTIM'S CHARACTER TRAIT FOR PEACEFULNESS.

   B. THE PROSECUTOR IMPROPERLY ELICITED TESTIMONY FROM HIS EXPERT WITNESS ABOUT THE APPEARANCE OF SPECIFIC PEOPLE ON THE VIDEO SHOWN TO THE JURY, IN VIOLATION OF A COURT ORDER WHICH WAS MADE PURSUANT TO A STIPULATION BY THE PARTIES.

   C. THE PROSECUTOR VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHTS BY DISPARAGING DEFENSE COUNSEL, DEFENSE WITNESSES AND THE DEFENDANT HIMSELF.

IV. ABUSE OF DISCRETION BY TRIAL JUDGE SUPPRESSING FAVORABLE MATERIAL EVIDENCE EITHER TO GUILT OR PUNISHMENT.

V. THE TRIAL COURT ABUSED ITS DISCRETION BY PRECLUDING THE DEFENDANT FROM PRESENTING HIS INVESTIGATOR (JOHN D. GIFFORD) TO TESTIFY ON BEHALF OF THE DEFENSE TO REBUT THE PROSECUTION'S WITNESSES ABOUT VIDEO EVIDENCE THAT WAS INTRODUCED AT TRIAL WHICH DENIED THE DEFENDANT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL.

VI. THE TRIAL COURT ABUSED ITS DISCRETION BY PRECLUDING THE DEFENDANT FROM INTRODUCING CHARACTER EVIDENCE OF THE VICTIM TO BE USED AS A DEFENSE OF PROVOCATION AND TO SHOW A SCHEME, PLAN, SYSTEM UNDER MRE 404(B).

VII. DEFENDANT RECEIVED DEFICIENT AND INADEQUATE REPRESENTATION ON HIS APPEAL OF RIGHT BY HIS APPELLATE COUNSEL THUS DENYING HIM HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

7. Respondent filed his answer on June 20, 2007. He contends that petitioner's fourth

through sixth claims are barred by petitioner's procedural default in the state courts, and that petitioner's remaining claims are without merit.

8.     Petitioner filed a brief in support of his habeas application on August 2, 2007.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from the assaults of Norman Maline, Michael Scott, and Michael Yott on February 24, 2001. The evidence adduced at trial was accurately summarized by petitioner's counsel in her brief to the Michigan Court of Appeals:

> The incident arose out of an altercation at the BP Gas Station located at the intersection of Nine Mile Road and Hoover Road in the City of Warren, Michigan, at approximately 2:30 a.m. on February 24, 2001. It was undisputed that Mr. Patterson and his brother, Maurice Alfred, had left the Hot Rocks bar in Warren just after 2:00 a.m. in a Gold Chevrolet Baretta, and that at approximately the same time Norman Maline, Michael Scott, Michael Yott, James Lowrey, Justin Burns and a young woman named Wendy had left the same bar in Mr. Yott's Black Chevrolet Baretta. (T III, 122; T IV, 9; T VII, 114, 186). No evidence at trial revealed an altercation between the two groups at Hot Rocks or upon departure from the bar (T III, 122; T IV, 10; T VII, 116, 188), but a short distance down the road near the BP Gas Station, the parties in the two cars encountered each other, triggering a serious of events that left Norman Maline dead, Mr. Yott and Mr. Scott injured, and Mr. Patterson charged with murder and two counts of assault with intent to do great bodily harm less than murder.
>
> Once they were at or near the gas station, Norman Maline broke the Defendant's passenger side window (T IV, 81; T VII, 141), prompting Maurice Alfred to get out of the Defendant's car and he began fighting with Norman and the men from the other car. It was the prosecution's theory that Mr. Patterson intentionally drove his car through the BP Gas Station, in an effort to kill the people responsible for breaking his car window. (*See generally*, Prosecution's Opening Statement, at T II, 74-87). The defense maintained that Mr. Patterson drove through the parking lot in an attempt to defend his brother who was being beaten up by these men. The defense further asserted that Mr. Patterson did not intend to harm or kill anyone, but that the injuries sustained by Norman Maline, Michael Scott and Michael Yott were accidental and/or done in self-defense or in defense of the Defendant's brother. (*See generally*, Defense Opening Statement, at T II, 87-101).
>
> At approximately 2:23 a.m., Warren Police Officer Robert Horlocker was dispatched to the BP Gas Station at Nine Mile and Hoover Roads, with information about a fight and people down. (T II, 107-109). Upon arrival he noticed a body in the intersection, and upon closer inspection he heard gurgling but the person was not responsive. (T II, 116). Medical personnel arrived within seconds to assist the man in the intersection, so the officer began gathering information from witnesses who

described the car that was traveling through the parking lot and hit this man, later identified as Norman Maline. (T II, 121).

Norman Maline died, and Macomb County Medical Examiner Dr. Werner Spitz opined that the cause of death was interstitial emphysema (his chest was compressed – although there were no broken bones) and multiple injuries and/or indications of injuries resulting from being struck and run over by an automobile. (T II, 160-68, 172, 175, 184, 185; T III, 46). The doctor testified that at the time of death Norman Maline had a blood alcohol level of .156 percent, and his blood indicated the presence of a small amount of marijuana that could have been ingested up to a day or two before Mr. Maline died. (T II, 171; T III, 48-49). Mr. Maline's mother testified that her son was 25 years old at the time of his death. (T II, 102).

The prosecution called two women who happened to be passers-by on the night in question, Rose Leggatt and Shelli Worsham. Ms. Leggatt was driving near Nine Mile and Hoover on her way home, dropping off a friend, when she noticed a fight break out at the BP Gas Station. (T III, 57). Ms. Leggatt saw a car circling and driving in and out of the parking lot really fast, and then she saw the man later identified as Norman Maline hit by the car and the driver kept going without making any effort to stop. (T III, 57-62). According to Ms. Leggatt, Norman Maline was either running from somebody or after the car when he was hit. (T III, 58, 69). However, according to Ms. Worsham, who testified as a witness to essentially the same events (T III, 91-95) when he got hit by the car Norman Maline was standing in the parking lot helplessly as four other men were beating on him. (T III, 96-98). Ms. Worsham also saw the man later identified as Michael Yott hit by the same vehicle. (T III, 94). Ms. Leggatt could not say for sure if the driver of the car deliberately hit Mr. Maline, but Ms. Worsham indicated her belief that Maline was intentionally hit by the driver. (T III, 59-60, 64-66, 95).

Michael Scott, one of the victims in the case, was called by the prosecution to describe the events that occurred on February 24, 2001. After prefacing his testimony with information about the victim, Norman Maline, not being a racist (T III, 114-117), he detailed his departure from the Hot Rocks bar and subsequent altercation at the BP Gas Station. Mr. Scott stated that he and some friends (Norman Maline, Michael Yott, James Lowrey, Justin Burns, and a woman named Wendy) left Hot Rocks in Michael Yott's car shortly before it closed and drove out of the parking lot without incident. (T III, 121-122). As they left, a Gold Baretta with two men inside started swerving towards Yott's car, and Yott avoided them by driving into the BP Gas Station. (T III, 124-135). From there, the four male passengers in Yott's vehicle got out of the car and a fight ensued with one of the men from the Gold Barretta. (T III, 125-126, 129). As Mr. Scott backed off and the fight began to break up, he was hit by that car. (T III, 126-127). Although he testified on direct examination that he pulled himself to safety and saw Norman Maline and Michael Yott hit by the same automobile as it drove through the parking lot two more times (T III, 127), cross-examination established that Mr. Scott did not actually see Maline struck by the car because he was looking at Mr. Yott and trying to get up himself. (T IV, 60-61). Mr. Scott sustained minor scrapes and bruises and believed that he was intentionally hit by the Gold Barretta. (T III, 128-129). Mr. Scott also believed that the Gold Barretta hit Norman Maline and

Michael Yott on purpose, although he conceded that he did not know exactly what was going through the driver's mind. (T III, 131; T IV, 64).

Justin Burns, a passenger in the Black Barretta, also noticed the Gold Barretta swerving at Yott's car, and confirmed that a fight subsequently broke out at the BP Gas Station with the four male passengers against the one passenger from the Gold Barretta. (T IV, 10-12, 29, 50). Mr. Burns saw the Gold Barretta hit Mr. Scott, Mr. Yott and Mr. Maline and believed that the driver was intentionally trying to hit these men. (T IV, 14-15).

Detective Randall Ricotta of the Warren Police Department testified in his capacity as an expert in reconstructing accidents. (T IV, 77). The detective spent some time examining evidence found at the gas station and also was involved in the arrest of Mr. Patterson and seizure of his Gold Barretta automobile. (*See generally* T IV, 74-122; T V, 4-68). Detective Ricotta testified that Mr. Patterson's car had Norman Maline's blood on it, which was found on the interior wheel well of the driver's rear tire. (T IV, 81). The gas station itself had evidence of an accident in terms of broken glass in the street, marks on the roadway, pulverized cement and tiremarks on the curb. (T IV, 81-82). The physical evidence from the scene suggested to the detective that the driver of the Gold Barretta was driving somewhere between 20 to 25 miles per hour when Norman Maline was struck, although it could be slower than that. (T IV, 84-88). In other words, the detective stated that everything he examined was consistent with this being a low velocity incident. (T IV, 104). Detective Ricotta also viewed videos from the security cameras at the BP Gas Station and concluded that the driver of the Gold Barretta intentionally and deliberately hit Mr. Maline because the driver was skilled and in control and performed no evasive maneuvers to avoid hitting Mr. Maline, Mr. Scott nor Mr. Yott. (T IV, 94-97, 108; T V, 67). Detective Ricotta testified that the video evidence helped him in part form his opinion in this case. (T IV, 97). Although the video evidence was not clear, examination of Maline's clothes and blood found under the Gold Barretta suggested to the detective that Maline was under the vehicle at some point. (T IV, 99, 110). Detective Ricota believed that if Mr. Maline was under the influence of drugs or alcohol it would have impaired his ability to perceive and react to the car coming near him. (T V, 45, 57).

The final witness for the prosecution was the officer in charge, Detective Jeffrey Pierog from the Warren Police Department. Detective Pierog testified in his capacity as an expert in homicide investigations. (T V, 70, 87). After locating the Gold Barretta, which appeared to have been "parked hurriedly" on the side of Mr. Patterson's building, Detective Pierog effected the arrest of Mr. Patterson in his home at approximately 9:00 a.m. on February 24, 2001. (T V, 88-90, 127). The detective believed that Mr. Patterson's Gold Barretta was the same car used to hit Mr. Maline, Mr. Scott and Mr. Yott because Mr. Maline's blood was found on the car and Mr. Yott's fingerprint was found on the hood. (T V, 87-88). Detective Pierog came to this conclusion not only on this physical evidence but also based on witness accounts and after viewing the video from the gas station. (T V, 87). The video was played for the jury. (T V, 114). Furthermore, Detective Pierog interviewed Mr. Patterson after he was taken into custody and his statements were introduced through this witness to the

jury.  (T V, 92-93).

Mr. Patterson described to the detective the events that occurred after he and his brother Maurice Alfred ("Mo") left Hot Rocks.  (*See generally*, T V, 93-101; T VI, 7-14).  According to Mr. Patterson, his brother and a white woman kissed each other goodbye in the parking lot and as Mr. Patterson and his brother were driving away a car full of men began yelling racial slurs at them and tried to run them off the road.  When they were at the light at Nine Mile and Hoover, a young man (Norman Maline) got out of the car he was in, and came over and smashed in Mr. Patterson's passenger side window.  Mo got out of Mr. Patterson's car and began fighting with the men.  Mr. Patterson feared for his brother's life and did not want him to get out of the car in the first place.  In an effort to help his brother, Mr. Patterson panicked and began driving through the gas station parking lot circling around approximately three times, all the while looking around and behind him to see if anyone was going to shoot him or throw bricks at his car.  Eventually he drove away and went to his apartment because he was so afraid.  Mr. Patterson maintained that he did not know that he hit anyone, and that he never intended to hurt or kill anyone.  He expressed remorse for what happened.  He did not want to leave his brother at the gas station, and he stated that the entire accident was [an] unfortunate incident that could have been avoided.  (T V, 93-101; T VI, 7-14).

In all, the incident beginning with Mo getting out of the car until Norman being struck by the Gold Barretta lasted twenty-nine seconds.  (T VI, 15-43).  The videotape generally reveals and confirms all accounts of the Gold Barretta driving through the gas station three times; on the first pass Mr. Scott appears to be sideswiped or hit, on the second drive through no one is touched, and on the third and final pass Mr. Maline and Mr. Yott appear to be hit by the Gold Barretta.  (T VI, 62-65).  Detective Pierog described all three passes as attempts to hit Mr. Maline: "The first two, he was going in a circular pattern trying to hit [Norman] and he was unable to, so he changes his direction and does a beeline, what we call, I mean straight at him and he was successful at hitting Norman . . ."  (T VI, 55).

James Stocke testified for the defense in his capacity as an expert in crash testing and reconstruction involving the actions of a vehicle leading up to an accident.  (T VI, 115).  Mr. Stocke had a different interpretation and opinion of the events that occurred in the gas station on February 24, 2001, based on his viewing of video, coupled with the evidence and reports that he reviewed in preparation for the case.  (T VI, 116).  Contrary to the prosecution's witnesses, Mr. Stocke did not believe that there was evidence to support the assertion that Norman Maline was hit head on by the Gold Barretta; rather, he saw Norman Maline attempt to make an evasive move by jumping up, and when he came down the Gold Barretta passed over him.  (T VI, 120-141; T VII, 84).  Had Mr. Maline actually hit the hood of the car on impact, there would have been more damage to the hood.  (T VI, 141; T VII, 91-92).  Mr. Stocke's opinion differed from that of the prosecution's witnesses in terms of (1) the path of the vehicle, (2) the method used for determining the speed of the vehicle and (3) the determination that this was an intentional effort to run anyone down.  (T VII, 26).  Even though the defense expert conceded that it was unsafe to drive through the parking lot at seventeen miles per hour (the rate that he determined the vehicle to be

traveling) he still opined that the entire situation was simply an accident. (T VII, 21, 80).

Another witness for the defense, Mr. Kenneth Glaza, testified that he was the person who reconstructed and enhanced the video introduced at trial. Mr. Glaza stated that in working with the video, various frames were missing so that you could not get a complete, continuous picture of the events that occurred, due to the rotation of the various cameras. (T VIII, 56).

Maurice Alfred's testimony comported with Mr. Patterson's version of events, and but [sic] he was able to more fully describe the situation that he was in while being attacked by four men. (T VII, 186-190; T VIII, 5-6). According to Mr. Alfred, he was defending and fighting for his own life, and did not see the incident that resulted in Norman Maline's death. (T VIII, 6, 16-18, 24-25, 27). A friend came to the gas station shortly after and picked him up to go home. He later learned that his brother was arrested for murder. (T VIII, 9-11).

Def.-Appellant's Br. on Appeal, in *People v. Patterson*, No. 239702, at 1-9 (Mich. Ct. App.).

C.      *Procedural Default*

Respondent first contends that petitioner's fourth through sixth claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Even were the Court to conclude that petitioner's claims are procedurally defaulted, it is still necessary to consider the claims on the merits. Petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have

succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts

them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.     *Sufficiency of the Evidence (Claims I & II)*

Petitioner first contends that there was insufficient evidence presented to support his convictions for both involuntary manslaughter and assault with a deadly weapon. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more

deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).


2.    *Analysis*

*a. Involuntary Manslaughter*

"In Michigan, the penalty for manslaughter is codified, but the definition is left to the common law." *People v. Datema*, 448 Mich. 585, 593, 533 N.W.2d 272, 276 (1995). In *Datema*, the court noted that "[c]ommon-law manslaughter has two broad categories: voluntary and involuntary," and further explained that the "two categories entail distinct elements and apply in different circumstances, but are often misapplied." *Id*. at 594, 533 N.W.2d at 276. Attempting to clarify the distinction between voluntary and involuntary manslaughter, the *Datema* court explained that manslaughter in general is "any homicide which is neither murder nor innocent homicide, and such a killing may be either intentional or unintentional." *Id*. (internal quotation omitted). The court further explained that "[v]oluntary manslaughter is any killing with a person-endangering state of

mind that is neither murder nor innocent homicide, or an unlawful homicide with a person-endangering state of mind that would be murder in the absence of mitigation." *Id.* And, the court explained, "[i]nvoluntary manslaughter is a catch-all concept including all manslaughter not characterized as voluntary[.]" *Id.*

Turning to involuntary manslaughter more specifically, the court reaffirmed its longstanding definition of the crime:

> "the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty."

*Id.* at 595-96, 533 N.W.2d at 276 (quoting *People v. Ryczek*, 224 Mich. 106, 110, 194 N.W. 609, 611 (1923) (internal quotation omitted)). The court explained that "[t]his definition sets forth three different theories giving rise to involuntary manslaughter liability. These theories are not mutually exclusive, and, under the proper circumstances, multiple theories may be appropriate." *Id.* at 596, 533 N.W.2d at 276-77.

Here, there is no question that sufficient evidence was presented to the jury from which it could conclude beyond a reasonable doubt that petitioner was grossly negligent in operating his vehicle, and that this gross negligence resulted in the death of Maline. The witnesses testified that petitioner drove at an unsafe speed through the gas station, that he circled three times, and struck the victims on two of the passes through the gas station. In addition, the jury viewed a video of the incident. Indeed, the only real question at trial was petitioner's state of mind at the time of the offense, and as evidenced by the jury's acquittal of petitioner on the second degree murder charge the jury accepted petitioner's defense that he did not intend to kill Maline. This evidence is sufficient to establish that petitioner was grossly negligent in operating his vehicle, and that his gross negligence

caused Maline's death. Thus, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that petitioner was guilty of involuntary manslaughter. *Cf. People v. Moseler*, 202 Mich. App. 296, 298-99, 508 N.W.2d 192, 193-94 (1993); *People v. Hepburn*, No. 258288, 2006 WL 708160, at *1 (Mich. Ct. App. Mar. 21, 2006) (per curiam).

Petitioner nevertheless contends that the evidence was insufficient because the evidence supported his claim of accident, and that the court should have given this requested defense instruction. The existence of a valid accident defense, however, is irrelevant to petitioner's involuntary manslaughter conviction because involuntary manslaughter by its nature subsumes the accident defense. As the Michigan courts have explained, because involuntary manslaughter is not an intent crime, accident is not a defense; rather "'accident' is subsumed within the charge of involuntary manslaughter because the jury must consider whether the defendant's conduct was negligent, careless, reckless, wilful and wanton, or grossly negligent." *People v. Hess*, 214 Mich. App. 33, 39, 543 N.W.2d 332, 335-36 (1995); *see also*, *People v. Newman*, 107 Mich. App. 535, 547 n.4, 309 N.W.2d 657, 661 n.4 (1981) (Bronson, J., dissenting) (noting that an argument for an accident instruction in the context of an involuntary manslaughter charge "makes no sense since the gravamen of [the] offense[] is an accidental killing."). Indeed, in acquitting petitioner of the murder charge and convicting him of involuntary manslaughter, the jury accepted petitioner's defense that he did not intend to kill Maline and that his striking Maline was accidental; the jury simply concluded that the accident resulted from petitioner's gross negligence. Thus, neither the failure to give an accident instruction nor petitioner's accident evidence calls into question the sufficiency of the evidence supporting his involuntary manslaughter conviction.

Petitioner also contends that the evidence is insufficient because the evidence was contradictory and incredible. The Court should disagree. It is true that there were some discrepancies

in the various accounts given by the witnesses. This is not surprising: all of the participants had been in the bar drinking before the incident and the incident lasted a total of about 30 seconds. Nevertheless, the testimony was consistent on the basic facts, which were not disputed even by petitioner, and that incident was captured on video played for the jury. The only real question, as noted above, was petitioner's intent at the time he struck the victims with his car. Although several of the witnesses testified that it appeared petitioner intentionally ran down Maline, the jury *rejected* this testimony in finding petitioner guilty of involuntary manslaughter rather than second degree murder. In any event a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995). It is the job of the jury, not a reviewing court, to resolve conflicts in the evidence, and a reviewing court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996)

Finally, in his reply brief petitioner contends that the state should be estopped from arguing that the evidence is sufficient to sustain a conviction for involuntary manslaughter because at trial the prosecutor argued that petitioner was *not* guilty of involuntary manslaughter. This argument is without merit. "Judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument in another phase.'" *Valentine-Johnson v. Roche*, 386 F.3d 800, 811 (6th Cir. 2004) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749

(2001) (internal quotation omitted)); *see also*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995). To successfully assert judicial estoppel, however, it is not enough for the party asserting estoppel to show that the party sought to be estopped took a contrary position in earlier litigation. It must also show that "the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Eubanks v. CBSK Fin. Group, Inc.*, 385 F.3d 894, 897 (6th Cir. 2004) (quoting *Teledyne Indus., Inc. v. National Labor Relations Bd.*, 911 F.2d 1214, 1218 (6th Cir. 1990)); *see also*, *Valentine-Johnson*, 386 F.3d at 811; *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002).

Judicial estoppel is not a constitutionally mandated doctrine, and "it has apparently never been applied against the government in a criminal case." *Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995); *United States ex rel. Oliver v. Jones*, No. 07 C 2546, 2007 WL 2409843, at *5 (N.D. Ill. Aug. 22, 2007); *cf. Best v. Lampert*, No. 05-1488, 2007 WL 2746931, at *5 (D. Or. Sept. 18, 2007) ("[P]etitioner does not cite, and the court is unable to find, any authority for the proposition that the deference afforded to state court decisions during the adjudication of a federal habeas action is simply not due where a respondent took inconsistent positions during direct and collateral state court proceedings."). In any event, even if the doctrine were applicable in a habeas proceeding, petitioner has not established the requisites for the application of the doctrine. As noted above, judicial estoppel prevents a party from advocating a position inconsistent with an earlier position only where the court adopted that earlier position. Here, even assuming that the prosecutor's closing argument statement that the evidence supported a verdict of guilty on second degree murder rather than involuntary manslaughter is inconsistent with respondent's current argument that the evidence of involuntary manslaughter was sufficient beyond a reasonable doubt,[2] the jury acquitted petitioner of second degree

---

[2]Although not necessary to resolve petitioner's argument, I note that there is no actual inconsistency here. The prosecutor was merely arguing that second degree murder better fit the

murder and found him guilty of involuntary manslaughter, and the Michigan Court of Appeals found the evidence of involuntary manslaughter sufficient. Thus, the prosecutor's purportedly contradictory argument was not adopted by the state courts, and judicial estoppel is therefore inapplicable.

In short, the prosecution presented sufficient evidence to prove each element of involuntary manslaughter beyond a reasonable doubt, and the court of appeals's rejection of petitioner's claim was a reasonable application of *Jackson*. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[3]

### b. Assault

Petitioner also contends that there was insufficient evidence to support his convictions for assault because there was no evidence that he intended to assault Scott and Yott. Petitioner also argues that the evidence supported his defense of others defense, and that the court should have

---

evidence than involuntary manslaughter. *See* Trial Tr., Vol. IX, at 29-31. This in no way constituted an argument that, as a legal matter, the evidence of involuntary manslaughter was constitutionally insufficient to prove involuntary manslaughter beyond a reasonable doubt.

[3]In the state courts, petitioner also argued that the evidence was insufficient because the trial court failed to instruct the jury on the victim's contributory negligence as a defense. Petitioner does not appear to be raising this argument here. In any event, the Michigan Court of Appeals rejected this claim because, under Michigan law, a victim's contributory negligence may go to the causation element of the crime, but it does not constitute a defense. *See Patterson*, 2003 WL 22160441, at *4, slip op. at 4 (citing *People v. Tims*, 449 Mich. 83, 97-98, 534 N.W.2d 675, 681 (1995)). As explained above, however, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case," *Patterson*, 432 U.S. at 211 n.12; *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney*, 421 U.S. at 691. Contributory negligence as a defense to criminal liability does not represent "a "fundamental principle, so as to limit the traditional recognition of a State's capacity to define crimes and defenses." *Clark v. Arizona*, 548 U.S. 735, ___, 126 S. Ct. 2709, 2719 (2006), as evidenced by the universal and long-standing rejection of the defense. *See United States v. Schmidt*, 626 F.2d 616, 617 n.2 (8th Cir. 1980); 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW, § 6.5(c) (2d ed. 2003); C. V. Verters, *Homicide or assault in connection with negligent operation of automobile or its use for unlawful purpose*, 99 A.L.R. 756, § II.e.2 (1935 & Supp. 2007).

instructed on accident. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

The jury heard the testimony and saw the video of the accident, and concluded that petitioner intended to and did assault Scott and Yott with his car. The jury was free to infer petitioner's intent from the circumstances. In particular, the prosecution was not required to show that petitioner intended to hit Scott or Yott with his car. The elements of assault with a dangerous weapon are: "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injury or place the victim in reasonable apprehension of an immediate battery." *People v. Avant*, 235 Mich. App. 499, 505, 597 N.W.2d 864, 869 (1999); *People v. Davis*, 216 Mich. App. 47, 53, 549 N.W.2d 1, 5 (1996). Even if there was not sufficient evidence presented to conclude that petitioner intended to hit Scott and Yott, the jury was certainly free to conclude, based on petitioner's actions in driving at high speed (for the circumstances) toward Scott and Yott, that he intended to place them in reasonable apprehension of an immediate battery. *See People v. Derrickson*, No. 255263, 2006 WL 51394, at *1 (Mich. Ct. App. Jan. 10, 2006); *People v. Busch*, No. 258819, 2006 WL 1083633, at *1-*2 (Mich. Ct. App. Apr. 25, 2006). This conclusion also resolves petitioner's argument that the jury should have been instructed on the defense of accident: even if he struck Scott and Yott accidentally, there is no argument that he drove toward them accidentally, and this action was sufficient for the jury to conclude that he intended to place Scott and Yott in reasonable apprehension of an immediate battery.

Finally, petitioner is not entitled to habeas relief based on his argument that the evidence supported his defense of others defense. Under the defense of another theory, "the third party steps into the shoes of the individual threatened," *People v. Heflin*, 434 Mich. 482, 511 n.26, 456 N.W.2d 10, 23 n.26 (1990), and thus a defendant's right to use deadly force is dependent upon the rules governing the threatened individuals right to self-defense. *See People v. Kurr*, 253 Mich. App. 317,

320-21, 654 N.W.2d 651, 653-54 (2002). Under Michigan law, self-defense is available only "if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." *People v. Kemp*, 202 Mich. App. 318, 322, 508 N.W.2d 184, 187 (1993). Further, "[a] defendant is not entitled to use any more force than is necessary to defend himself," *id.* at 323, 508 N.W.2d at 187, and the defendant must "ha[ve] done 'all which was reasonably in his power to avoid the necessity of extreme resistance, by retreating where retreat is safe.'" *People v. Stallworth*, 364 Mich. 528, 535, 111 N.W.2d 742, 746 (1961) (quoting *Pond v. People*, 8 Mich. 150, 175).

In petitioner's case, the prosecution presented significant evidence from which the jury could reject petitioner's testimony and conclude that he did not act in defense of his brother. For example, there was conflicting evidence regarding who was the initial aggressor and the stage of the fight (and thus the danger facing petitioner's brother) at the time petitioner struck Scott and Yott. Further, there was no evidence that any of the participants were armed with a weapon. Petitioner's brother himself testified that he held up his own in the fight, *see* Trial Tr., Vol. VIII, at 8, and that he "defended [him]self" and "kicked [Maline's] ass," *see id.* at 12, 16-17. He also testified that after the initial confrontation he chased two guys into the gas station and wanted to keep fighting. *See id.* at 20-21. In his statement to the police, petitioner's brother indicated that several others were helping him in the fight, suggesting that he was not outnumbered 5 to 1 as claimed at trial. *See id.* at 21-22. Petitioner's brother also testified that he was not struck by the car, nor was the car close to him, suggesting that petitioner's car struck men who were not presently engaged in fighting him. *See id.* at 27-28. Further, there was no evidence presented that petitioner's brother suffered any injuries during the fight. From this evidence, the jury could have concluded that petitioner "chose to turn a simple fistfight into a deadly confrontation by using his [car]." *United States v.*

*Looney*, 48 M.J. 681, 688 (Army Ct. Crim. App. 1998). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by several instances of prosecutorial misconduct. Specifically, petitioner contends that the prosecutor committed misconduct by: (1) introducing evidence of the victim's character for peacefulness; (2) improperly eliciting testimony from the prosecution's expert witness about the appearance of specific people on the video shown to the jury; and (3) disparaging defense counsel, defense witnesses, and petitioner. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

2.    *Analysis*

*a.  Evidence of the Victim's Character*

Petitioner first contends that the prosecutor committed misconduct by introducing evidence of the victim's character for peacefulness during the prosecutor's case-in-chief.  However, as the Michigan Court of Appeals observed, the testimony in question did not go to Maline's general character for peacefulness, but to the specific question of Maline's racial attitudes, *see Patterson*, 2003 WL 22160441, at *1, slip op. at 2; Trial Tr., Vol. III, at 115-16, an issue which was rendered relevant by petitioner's assertion that Maline and his friends had started the altercation out of racial animus.  Because the state courts concluded that this evidence was admissible, the prosecutor did not commit misconduct by introducing the evidence.  *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

*b.  Expert Witness Testimony*

Petitioner next contends that the prosecutor committed misconduct when he questioned Detective Pierog during the playing of the video to the jury.  During the playing of the video, Detective Pierog gave a sort of play-by-play description of what was occurring on the tape.  As part of this description, Detective Pierog identified various people on the video, in apparent violation of a stipulation and order which precluded the prosecutor from introducing evidence in the form of comments by Pierog as to whom and what was reflected on the videotape.  *See Patterson*, 2003 WL 22160441, at *2, slip op. at 2-3; Trial Tr., Vol. V, at 115-18.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Even if the prosecutor committed misconduct in his questioning of Pierog, petitioner has failed

to show how Pierog's identification of any people on the tape deprived him of a fair trial. The tape was admitted as an exhibit, and most of the people on the tape testified at trial. Thus, the jury was capable of identifying for itself who was doing what on the tape. Further, counsel cross-examined Pierog extensively about what was happening on the tape, including who various people on the tape were and what they were doing. *See* Trial Tr., Vol. VI, 15-43. In these circumstances, petitioner cannot show that Pierog's testimony identifying certain of the participants deprived him of a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. *Disparaging Defense Counsel, Witnesses, and Petitioner*

Finally, petitioner contends that the prosecutor committed misconduct by disparaging defense counsel, defense witnesses, and him. Most of the comments challenged by petitioner can be addressed briefly. For example, the comments by the prosecutor that petitioner identifies as impermissibly suggesting that counsel was trying to trick or mislead the jury were fair responses to defense counsel's mischaracterizations of prior statements or witnesses, or counsel's failure to include complete statements from prior statements given by witnesses. *See* Trial Tr., Vol. II, at 126-27, 128-29; Vol. III, at 35, 43, 141; Vol. IV, at 34-35, 42-43; Vol. V, at 141; Vol. VI, at 17, 30; Vol. VIII, at 33. Likewise, the prosecutor's reference to defense counsel's "improper" questions or interrupting of witnesses were merely properly placed evidentiary objections and objections to counsel not allowing witnesses to completely answer the questions posed. *See* Trial Tr., Vol. II, at 95, 176, 181, 189; Vol. III, at 76, 98, 100, 134, 144; Vol. IV, at 19, 47, 53, 68, 120; Vol. V, at 45, 138; Vol. VI, at 138, 150; Vol. VII, at 166-67; Vol. VIII, at 62-63, 69, 79. The prosecutor's comments about counsel wasting time were in the context of proper objections on the grounds of relevance or hearsay, or based on defense counsel's repeating points already covered, and thus were not improper. *See* Trial Tr., Vol. II, at 184; Vol. IV, at 14, 26, 35, 63; Vol. V, at 31, 39, 42, 44, 125; Vol. VI, at 6, 12, 38; Vol. VII, at

4-5.

Both the court and the prosecutor mentioned several times that the tape which was ultimately played to the jury was prepared by the defense team, but with funds provided by the county. *See* Trial Tr., Vol. III, at 30; Vol. V, at 108; Vol. VI, at 44-45; Vol. VIII, at 52-54, 60. However, the prosecutor did not argue that the tape was unworthy of belief; on the contrary, the prosecutor agreed that the defense tape was the best representation of the video recorded by the gas station's security cameras. No other argument was made regarding the relevance of the use of county funds to the determination of petitioner's guilt or innocence. Thus, petitioner cannot show that these comments deprived him of a fair trial.

The prosecutor's comment on defense counsel's discovery violation was brief, made in the context of defense counsel's failure to provide copies of exhibits to the prosecutor before presenting them to the court, and was not offered as a basis to preclude admission of the exhibit. *See* Trial Tr., Vol. VI, at 134-35. Again, petitioner has failed to show how he was prejudiced by this brief statement. The prosecutor's comment that defense counsel's objection to his expert's lack of qualification to testify about wounds was from "left field" was a proper response based on the fact that the prosecutor was questioning the witness about the speed of petitioner's car in his capacity as an accident reconstruction expert. *See* Trial Tr., Vol. IV, at 85. Contrary to petitioner's argument, the prosecutor did not accuse defense counsel of lodging excessive objections; rather, in a discussion of how long it would take to read Yott's preliminary examination testimony to the jury, the prosecutor simply noted that about 25 pages of the transcript consisted of defense counsel's objections, which would not be read to the jury. *See* Trial Tr., Vol. VII, at 110. The prosecutor's question to a witness regarding whether she had "x-ray vision" and whether any one else in the universe heard statements she testified that she heard, while perhaps overly colorful, were interposed for the proper purpose of

establishing that the witness could not see what was occurring several hundred feet behind her and could not point to any witness who could corroborate her observations. *See* Trial Tr., Vol. VII, at 174, 177.

The prosecutor repeatedly noted, both in his examination of the witness and during closing arguments, that petitioner's expert was a "hired gun" and sarcastically referred to him as "Mr. Expert." *See* Trial Tr., Vol. VII, at 22, 28, 34, 44, 54; Vol. IX, at 25, 68-69. While the sarcasm was improper, petitioner cannot show that he was denied a fair trial because the substance of the prosecutor's comments were "a fair statement on the facts, a legitimate argument about evaluating the credibility of petitioner's expert, and an invited response to defense counsel's statement that Petitioner's expert was more credible than the People's expert." *Everett v. Fischer*, No. 00-CV-6300, 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002). Further, any prejudicial effect was ameliorated by the fact that all of the witnesses were questioned extensively regarding their qualifications and the bases of their opinions, and thus the jury was able to evaluate for themselves the probative weight of the witnesses' testimony. *See United States ex rel. Hamilton v. Ellingsworth*, 692 F. Supp. 356, 369-70 (D. Del. 1988).

Finally, there was nothing improper in the prosecutor's reference to the "stories" given by petitioner and his brother to the police, *see* Trial Tr., Vol. VI, at 54; Vol. VIII, at 31; to petitioner's brother as Pinocchio and a liar, *see* Trial Tr., Vol. IX, at 22, 43; to petitioner as "Rip Van Winkle" because he claimed to have slept through five minutes of pounding on the door by the police, as part of the prosecutor's argument that petitioner was attempting to evade capture, *see* Trial Tr., Vol. IX, at 40, 42; or to petitioner's version of events as a story which a five-year-old would not believe, *see* Trial Tr., Vol. IX, at 35-38. In context, each of these statements was based on arguments from the evidence presented and called on the jurors to use their common sense in evaluating the evidence.

A prosecutor's comment is not improper to the extent it is a permissible characterization based on the evidence admitted at trial. *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence); *United States ex rel. Williams v. Washington*, 913 F. Supp. 1156, 1163 (N.D. Ill. 1995) (prosecutor's assertion during closing argument that the defendant had "lied" did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable inferences drawn from the physical evidence and witness testimony[.]"); *cf. Kappos v. Hanks*, 54 F.3d 365, 367-68 (7th Cir. 1995) (petitioner not denied a fair trial where prosecutor referred to him as a "murderer" and "artful liar"). Further, "[i]t is well established that juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. While common sense is no substitute for evidence, common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." *U.S. v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) (internal quotation omitted). Thus, the prosecutor was permitted to urge the jury to use its common sense in evaluating the testimony offered at trial. *See United States v. Catano*, 65 F.3d 219, 228 (1st Cir. 1995); *United States ex rel. Hamilton v. Ellingsworth*, 629 F. Supp. 356, 366 (D. Del. 1988).

In short, the trial in this case was hotly contested, and both attorneys as well as the trial judge were at times less than dispassionate. None of the statements identified by petitioner, however, were anything other than permissible comments based on the evidence or in response to the actions or statements of defense counsel. Petitioner has failed to demonstrate that the comments taken as a whole and viewed in light of the entire evidence, which included not only the testimony of numerous eyewitnesses and experts but a video of the incident, were so flagrantly improper and prejudicial that

they denied him a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G. *Evidentiary Claims (Claims IV-VI)*

Petitioner next raises several evidentiary claims. First, petitioner contends that he was denied a fair trial by the exclusion of a video tape prepared by Detective Pierog. Second, he contends that the trial court erred in precluding his investigator from testifying. Third, he claims that the trial court erred in precluding him from introducing other acts evidence of the victim. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1. *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the

fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Petitioner suggests that the trial court's evidentiary rulings excluding his evidence deprived him of his right to present a defense. To constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court). In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

2.      *Analysis*

*a. Video Evidence (Claim IV)*

Petitioner's claim relating to the video evidence is based on the trial court's exclusion of a tape made by Detective Pierog. Apparently, there was some difficulty in transferring the video obtained from the gas station's surveillance cameras to a format which would allow for viewing by the jury. The gas station's video system consisted of ten camera angles–only four of which showed anything relating to the incident at issue–which skipped from camera to camera, and the recording skipped frame by frame. Kenneth Glaza, defendant's expert, described how he prepared the video which was shown to the jury:

A:      . . . . I went to the gas station on Nine Mile and Hoover and I electronically hooked into their switcher and I recorded on a digital type device, digital recording device, a tape that was produced by an officer who came and put it in the electronic player.

. . . .

The source tape was delivered by an officer who came to the station at Nine Mile and Hoover. He produced the tape. And the operator or the owner of the gas station, I understand, was the one who operated the player. So the two of them played a tape for me, and I simply hooked up a digital recorder to record the information that was being given to me.

Q:      Okay. Now, can you say for sure that this tape is absolutely original?

A:      Yes, sir. I did nothing to alter any of the content of the program itself.

Q:      Okay. Do you have any comment about all the – about the presence of all the frames on this digital – can I call it copy, digital reproduction?

A:      Well, there is a number of steps that it took to get to this point. Okay. And each one of the steps I was very careful to preserve content. Now, I may have made some changes to the timbre, the contrast, the lightness and darkness, to enhance the picture so we can see detail that wouldn't otherwise be there.

. . . .

Q:     Can you say for sure that every frame of every second is on this tape?

A:     As best to my knowledge, I did everything, like I said, to preserve what was being feed [sic] to me from that original tape that was being played in that player.

Q:     How many camera angles were on the original tape?

A:     There may have been more than four camera angles but we were only concerned with four camera angles.

Q:     In those four camera angles, were you able to determine a rotation sequence of the camera[s]?

A:     There was no steady rotation sequence.  It was a matter of action within a frame holding the camera on a particular shot.

       . . . .

Q:     Can you say that every second on the original – I notice there was a time meter on the original.

A:     Yes, sir.

Q:     Can you say – are there any lapses in the time meter on the original?

A:     It would be hard for me to determine because I didn't really spend time analyzing the clock.  However, the problem is that there are frames that need to be seen that aren't being seen because the way the camera system works; when one camera is operating the others are shut off, so you get frames coming from one camera and you're missing information from the other angle and other views.

Q:     But they are not on the tape, right, because they are missing?

A:     Correct, they are missing.

Q:     So it is not like they are hidden somewhere.  They just don't get them because the camera can only take so many at a time.

A:     Exactly, yes, sir.

Trial Tr., Vol. VIII, at 50-56.  On cross-examination, Glaza testified that he was not suggesting that

the police had omitted any information from the tape prepared by Detective Pierog, and that the

31

enhanced tape he prepared was superior because it included camera angle #2, which was not on the police prepared tape, and because it was clearer and more easily placed frame by frame and in slow motion. *See id*. at 60-61.

Prior to the questioning of Detective Pierog, the prosecutor indicated that he was not going to introduce the tape prepared by Detective Pierog, and would instead rely on the superior tape produced by Glaza. *See* Trial Tr., Vol. III, at 5. Defense counsel sought to compel introduction of the Pierog tape based on Detective Ricotta's testimony that he formed his opinion based on viewing the videotape prepared by Pierog. *See id*. at 6-13. The trial court declined to order the prosecutor to play the Pierog tape, and indicated that he would rule on the admissibility of that tape if and when defense counsel sought to introduce it. *See id*. at 13-14. Counsel later sought to admit the Pierog tape. The court asked counsel: "Is there anything that is not in this tape that is in . . ." Trial Tr., Vol. VI, at 44. Counsel responded that the Pierog tape "does not show any of the detail . . . laid out" in the Glaza tape. *Id*. at 44-45. The prosecutor argued that the Glaza tape was the superior tape, and thus was the only one which needed to be admitted. *See id*. at 45. The judge declined to allow the Pierog tape into evidence. *See id*.

Outside the presence of the jury, counsel made a record regarding this issue. Counsel argued that the rule of completeness required the introduction of the Pierog video, because that was the video upon which Pierog and Ricotta based their opinions. *See id*. at 78-79. The trial court, suggesting that the other tape would be redundant, told counsel: "[I]f you want to go through them and you can just pick what is different, if you see there is something different, all right, we'll go into that. But to go through every one of these tapes I think is redundant and I think it would be unnecessary, particularly since you were responsible for putting the other tape together." *Id*. at 81. The prosecutor argued: "Here is the difference. We have 1 and 3 on [the Pierog] tape. We have 1, 2 and 3 on this tape.

32

Frames 1 and 3 are not as clear and they are faster on our tape, the original. They are slower and clearer on his tape. The jury saw the best evidence, his tape. To play our tape would be a waste of time because our tape does not contain anything not on his tape. Everything in our tape, Cameras 1 and 3, are on his tape." *Id*. at 82. Counsel responded that the Pierog tape was relevant because it was the tape upon which the prosecution witnesses based their opinions that petitioner had deliberately run down the victims, and that the Pierog tape omitted the activity in the parking lot before the victims were struck. *See id*. at 83-84. The prosecutor responded that "[b]oth witnesses testified very clear that they saw the enhanced tape several times before they testified in court, and that their opinion was based on seeing that tape." *Id*. at 85. The judge ruled that counsel could not introduce the Pierog tape at that time, explaining to counsel that "[i]f you want to look through those three tapes and you can find something in either of the other tapes that is not in that other tape, we'll take another look at it." *Id*. at 86.

In his habeas application, petitioner argues along the lines of his counsel's argument in the trial court, namely, that the trial court erred in excluding the Pierog video. In his supplemental brief, however, petitioner appears to change tack, arguing that the admission of the Glaza video denied him a fair trial because it was not complete and was not properly authenticated. Both arguments are without merit.

Turning first to the Pierog video, petitioner cannot show that the exclusion of this video deprived him of his constitutional rights or prejudiced him in any way. Nobody, including defense counsel and petitioner's expert, questioned that the Glaza tape was superior to the Pierog tape. By all accounts that Glaza tape included camera angle #2, which was not included in the Pierog tape, and was clearer and more easily watched. The only relevance of the Pierog tape that counsel could identify was that Pierog and Ricotta had based their opinions, and in particular their opinions that

petitioner's actions were intentional, on the tape made by Pierog. However, both Pierog and Ricotta

testified that they had viewed the Glaza tape several times and had based their opinions on that tape.

*See* Trial Tr., Vol. IV, 114; Vol. V, at 108. Further the jury, in convicting petitioner of involuntary

manslaughter instead of second degree murder, ultimately rejected those witnesses' opinions that

petitioner's actions were intentional. The Pierog tape included nothing that was included in the tape

shown to the jury, the Glaza tape was repeatedly presented to the jury and the witnesses questioned

extensively based on that tape, and the jury ultimately accepted, at least in part, petitioner's

characterization of the events. Because there was nothing on the Pierog tape that was not on the tape

shown to the jury, and because the witnesses based their conclusions on the Glaza tape, petitioner has

failed to show how the exclusion of the Pierog tape in any way "seriously undermined 'fundamental

elements of the [his] defense' against the crime charged." *Miskel*, 397 F.3d at 455 (quoting *Scheffer*,

523 U.S. at 315).[4]

In his reply brief, petitioner makes the converse argument of the one that he makes in his

initial application, arguing that he was denied a fair trial by the admission of the Glaza tape because

it was not properly authenticated under Rule 901, and that because the tape was intentionally edited

by the police to be an inaccurate representation of the original. This claim is without merit, because

it is based on a factual assertion which is contradicted by the record, in particular by petitioner's own

---

[4]Petitioner also presents this claim as a suppression of evidence claim under *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* prohibits "suppression by the prosecution of evidence favorable to an accused . . . where the evidence is material either to guilt or punishment." *Id*. at 87. Here, there was no suppression by the prosecution of the Pierog video; the record is clear that defense counsel had copies of all the videos that had been made by the police. Rather, petitioner complains only that the trial court improperly "suppressed" this evidence. While the trial court's exclusion of evidence may implicate other constitutional rights, such as the right to present a defense, it does not raise a claim under *Brady*. *See United States v. Sua*, 307 F.3d 1150, 1154 (9th Cir. 2002) ("Because the evidence was not suppressed by the government, but was excluded from evidence by the district court, there was no *Brady* violation.").

expert at trial. In his supplemental brief, petitioner asserts: "When the defense had a copy made from the original source, the Police took Detective Pierog's video to the gas station and placed it into the machine, which was recorded with the defense video. Thus, the Police and the prosecutor's version of events was placed into the defense video[.]" Br. in Supp. of Pet., at 40. This assertion, however, is contradicted by Glaza's testimony. Glaza explicitly testified that the tape he made is "absolutely original," taken off the original surveillance system recording and unaltered by him. *See* Trial Tr., Vol. VIII, at 53-54. Contrary to petitioner's assertion, Glaza did not at any point state that the tape was not authentic. *See id.* at 50-63. There were frames missing on his tape, but that was the result of the way the surveillance system operated, not because they were available but excluded from the tape. *See id.* at 56. Indeed, the tape produced at the gas station for Glaza to record could not have been the Pierog video, because it is undisputed that the Pierog video did not include camera angle #2, while the source tape from which Glaza made his video did include this camera angle. In short there was no evidence that the source tape from which Glaza made his copy was anything other than what the police claimed and Glaza confirmed it to be: the original video recorded by the gas station's surveillance system. Petitioner cannot show that he was denied a fair trial by the presentation of evidence which his own defense team prepared and which his own counsel sought to introduce into evidence.

In a separately filed motion, petitioner seeks an evidentiary hearing to explore the authenticity of the various video tapes. Similarly, in deciding whether an evidentiary hearing is necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts, 28 U.S.C. foll. § 2254, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (discussing *Cardwell v. Greene*, 152 F.3d 331, 338 (4th Cir. 1998)); *see also*,

*Alcorn v. Smith*, 781 F.2d 58, 59-60 (6th Cir. 1986) (applying pre-AEDPA law); *cf. Townsend v. Sain*, 372 U.S. 293, 312-13 (1963).  As the Supreme Court recently explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.
>
> It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing

*Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007) (citations and footnote omitted).

Petitioner argues that an evidentiary hearing is necessary to examine the authenticity and accuracy of the various videos.  Such a hearing, however, would not have the potential to advance petitioner's habeas claims.  Much of the argument in petitioner's motion for evidentiary hearing focuses on the original tapes made by Pierog and their use in the preliminary proceedings.  However, even if these videos were not accurate, and even if they were the sole basis on which petitioner was bound over for trial, petitioner would not be entitled to habeas relief.  It is an "established rule that illegal arrest or detention does not void a subsequent conviction." *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (citing *Frisbie v. Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886)).  Thus, "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." *Gerstein*, 420 U.S. at 119.  Because petitioner is now incarcerated pursuant to a valid conviction, he cannot challenge his conviction on the basis that he was arrested without probable cause or on the basis of an alleged defect in the state court's determination of probable cause for trial.  *See, e.g.*, *Montoya v. Scott*, 65 F.3d 405, 421 (5th Cir. 1995); *Biby v. Satran*, 619 F. Supp. 1563, 1567-68 (D.N.D. 1985).

With respect to the Pierog video's effect on the fairness of petitioner's trial, as noted above that tape was not shown to the jury, and Pierog and Ricotta testified that they viewed the enhanced and more complete tape prepared by Glaza, which did not alter their conclusions. Nor is there any evidence beyond petitioner's speculation that the source video for Glaza's reproduction was anything other than the original surveillance video as captured by the gas station's surveillance system. Glaza did not so testify; the police were ordered to turn over the original video by the trial court; and petitioner's counsel–who had seen both videos and who had vigorously and repeatedly raised a number of issues with respect to the videos–never once suggested that this was the case.[5] Speculative allegations or allegations which are contradicted by the record are insufficient to entitle a petitioner to an evidentiary hearing, *see Getsy v. Mitchell*, 495 F.3d 295, 312 (6th Cir. 2007); *Young v. Herring*, 938 F.2d 543, 560 & n.12 (5th Cir. 1991), and thus petitioner is not entitled to an evidentiary hearing on this claim. *See Richardson v. Moore*, 1:05CV257, 2007 WL 539641, at *16 (S.D. Ohio Feb. 15, 2007) (denying petitioner's request for "discovery of the original "unaltered" store security tape recordings of the events surrounding the shooting" where "other than petitioner's own suspect self-serving statements, there is simply no evidence in the record to suggest that the prosecution or police tampered with or otherwise altered the store security video tapes obtained from the crime scene.").[6]

In short, the original recordings made by the police were inadequate because they failed to include various camera angles, were of low quality, or were not in an easily viewable format.

---

[5]Indeed, in a letter addressed to petitioner's appellate counsel, trial counsel characterized the defense video as an enhanced video taken from the original surveillance tape using the gas station's surveillance system. *See* Pet., Ex. N.

[6]For the reasons explained here, I have entered a separate Order on this date denying petitioner's motion for an evidentiary hearing.

Petitioner requested and was granted funds to hire an expert to make a better reproduction, he hired an expert for that purpose, and introduced a tape at trial that everyone agreed was the best reproduction which could be presented to the jury.  The original, inadequate tapes prepared by the police were not played to the jury, and formed no basis of the evidence upon which the jury considered petitioner's guilt.  And nothing in the record supports petitioner's assertion that the defense reproduction prepared by Glaza was made from anything other than the original surveillance tape.  In these circumstances, petitioner cannot show that he was denied a fair trial either by the introduction of the Glaza tape or by the exclusion of the Pierog tape.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Defense Investigator (Claim V)

Petitioner next contends that the trial court erred in excluding his investigator from testifying as to who various people on the video tape were.  Petitioner contends that this testimony would have contradicted Detective Pierog's testimony concerning the various persons shown on the video.  Again, however, petitioner cannot show that he was denied a fair trial by the exclusion of this evidence.  To be sure, Pierog did identify certain people on the video and describe their actions.  However, counsel was able to extensively, and at times effectively, cross examine Pierog concerning his identifications of the participants.  Indeed, the principal identification made by Pierog on direct examination was of petitioner's brother raising his hands in the air in the fashion of a football referee signaling a touchdown, *see* Trial Tr., Vol. V, at 117-18, but counsel was able to get Pierog to disavow this identification on cross-examination, *see id*., Vol. VI, at 25-26, 28.  And, in any event, all but Yott testified at trial and were observed by the jury, which was therefore able to determine for itself who was doing what on the video.  Further, there was no dispute as to the identities of the victims or as to petitioner's identity as the driver of the car.  In these circumstances, it is doubtful that the testimony

of petitioner's investigator would have altered the jury's verdict. Accordingly, petitioner cannot show that he was denied a fair trial by the exclusion of this evidence and he is not entitled to habeas relief on this claim.

### c. Character Evidence of Victim (Claim VI)

Finally, petitioner claims that the trial court erred in excluding evidence that Maline, the deceased victim, had been convicted of unarmed robbery, assault with intent to do great bodily harm less than murder, aggravated assault, and criminal sexual conduct. Petitioner argues, as his counsel did in state court, that these convictions were relevant both to petitioner's self-defense claim and provocation to reduce the second degree murder charge to manslaughter, because they show that Maline had a propensity to violence and thus provided some evidence that he was the initial aggressor. The Court should conclude that petitioner is not entitled to habeas relief on this claim, because the convictions were not admissible and the exclusion of the evidence did not prejudice petitioner.

Petitioner's claim calls into question the interplay between Rules 404 and 405. Rule 404 provides that generally "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." MICH. R. EVID. 404(a). The Michigan version of Rule 404 then provides four exceptions to this general rule, the second of which allows introduction of "evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused" when "self-defense is an issue in a charge of homicide." MICH. R. EVID. 404(a)(2). There is no question that, under Rule 404(a)(2), evidence of Maline's character for aggression was admissible. The question, however, is in what manner petitioner was permitted to show that character. Rule 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." MICH. R. EVID. 404(b). Although petitioner argues that the convictions show a common scheme or

plan by Maline when confronted with a helpless victim, thus coming within one of the exceptions noted in Rule 404(b), the purpose of the evidence was not to establish a scheme or plan of Maline, because any such scheme or plan was not "material" as required by Rule 404(b). Rather, petitioner sought to introduce the prior convictions for the purpose of showing Maline's action in conformity with the conduct involved in this convictions, which is expressly prohibited by Rule 404(b).

That leaves Rule 405, which addresses the methods of proving character when character is admissible under Rule 404. Under Rule 405, when "evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion." MICH. R. EVID. 405(a). Specific instances of conduct, however, may be used to prove character only if "character or a trait of character of a person is an *essential element* of a charge, claim, or defense." MICH. R. EVID. 405(b). The Michigan courts, and the federal courts applying the analogous federal rules, considering the interplay between Rules 404 and 405 in cases involving a claim of self-defense, have held that Rule 404(b) does not permit the introduction of specific acts of the victim to establish the victim's propensity to violence. *See People v. Nichols*, 125 Mich. App. 216, 220-21, 335 N.W.2d 665, 667-68 (1983); *United States v. Keiser*, 57 F.3d 847, 853 (9th Cir. 1995). Reputation evidence is admissible to show that the victim was the initial aggressor, but specific instances of conduct are not admissible. *See People v. Harris*, 458 Mich. 310, 315-19, 583 N.W.2d 680, 683-85 (1998); *People v. Boles*, 127 Mich. App. 759, 764-65, 339 N.W.2d 249, 252 (1983), *rev'd on other grounds*, 420 Mich. 851, 358 N.W.2d 894 (1984); *Nichols*, 125 Mich. App. at 220-21, 335 N.W.2d at 668; *United States v. Gregg*, 451 F.3d 930, 934-35 (8th Cir. 2006). Specific instances of conduct are admissible to show the genuineness of the defendant's fear as an "essential element" of the defendant's self-defense claim under Rule 405(b), but only where the defendant knew of those specific instances of conduct. *See Harris*, 458 Mich. at 315-17, 583 N.W.2d at 683-84;

*Boles*, 127 Mich. App. at 764-65, 339 N.W.2d at 252; *United States v. Saenz*, 179 F.3d 686, 688-89 (9th Cir. 1999).

Here, petitioner was not entitled to offer specific instances of conduct–*i.e.*, the convictions of Maline–to prove that Maline was the first aggressor. As noted above, only reputation and opinion evidence of Maline's character was admissible for this purpose. Nor was petitioner entitled to offer the specific instances of conduct to show the reasonableness of his fear for his brother's life to support his defense of others claim because there is no evidence, and petitioner does not argue, that he knew of Maline's prior convictions. Thus, while evidence of Maline's character was admissible under Rule 404(a), under Rules 404(b) and 405 Maline's prior specific instances of conduct were not admissible. As the authorities discussed above indicate, this rule is consistently applied in both state and federal courts. And the application of these rules did not deprive petitioner of his right to present a defense, particularly in light of the facts that he was not precluded from presenting evidence of Maline's character through reputation or opinion evidence and that it was undisputed both that Maline had broken his car window and that petitioner's brother was engaged in a fight with several men. *See United States v. Bautista*, 145 F.3d 1140, 1152 (10th Cir. 1998); *United States v. Talamanta*, 981 F.2d 1153, 1157 (10th Cir. 1992); *State v. Ovitt*, 878 A.2d 314, 317 (Vt. 2005).

To the extent that petitioner claims evidence of Maline's prior violent acts was relevant to his claim of provocation, even if the prior instances of conduct by Maline would have been admissible for this purpose the exclusion of the evidence was harmless. Evidence of provocation would only have reduced the charge from second degree murder to voluntary manslaughter. Because petitioner was convicted of the lesser offense of involuntary manslaughter, he cannot show that he was prejudiced in his ability to establish provocation by the exclusion of Maline's prior violent acts. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Judicial Bias (Claim IV)*

In the state courts, petitioner raised a claim that he was denied a fair trial because the trial judge was biased against him.  He does not assert this claim as an independent claim here; however, he does include a judicial bias argument in connection with his claim relating to the video evidence.  To the extent petitioner intends to assert judicial bias as a basis for habeas relief, the Court should conclude that the claim is without merit.

1.      *Clearly Established Law*

Perhaps "[n]o right is more fundamental to the notion of a fair trial than the right to an impartial judge."  *Bracy v. Gramley*, 81 F.3d 684, 696 (7th Cir. 1996) (Rovner, J., dissenting), *rev'd*, 520 U.S. 899 (1997); *see also*, MASS. CONST. of 1780, pt. 1, art. 29.  Thus, "the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  *Bracy*, 520 U.S. at 904-05 (citation omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)).  "Because judicial bias infects the entire trial process it is not subject to harmless error review."  *Maurino v. Johnson*, 210 F.3d 638, 645 (6th Cir. 2000) (citing *Chapman v. California*, 386 U.S. 18, 23 & n. 8 (1966)); *see also*, *Rose v. Clark*, 478 U.S. 570, 577 (1986) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)).

Habeas relief on the basis of judicial bias is appropriate only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution."  *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995).  As a general matter, habeas relief will be appropriate only upon a showing that the trial judge was actually biased or prejudiced against the petitioner.  *See Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994).  However, in exceptional circumstances "the likelihood of bias or appearance of bias can, in certain circumstances, be so substantial as to create a conclusive presumption of actual bias."  *Id*. (internal quotation

omitted).  The appearance of bias situation is limited to cases in which "a judge is faced with circumstances that present some actual incentive to find one way or the other[,]" *id.* (internal quotation omitted); *see also*, *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc), such as where the judge has a pecuniary interest in the outcome or has been the target of repeated abuse by one of the parties.  *See Six v. Delo*, 885 F. Supp. 1265, 1271 (E.D. Mo. 1995), *aff'd*, 94 F.3d 469, 478 (8th Cir. 1996).

As the Supreme Court has noted in the context of the federal recusal statute, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."  *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see also*, *Liteky v. United States*, 510 U.S. 540, 549-51 (1994); *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988).  For this reason,

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved.

*Liteky*, 510 U.S. at 555.  Thus, "[a] judge's ordinary efforts at courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune." *Id*. at 556. Although *Liteky* was decided on the basis of the federal recusal statute, it provides guidance for resolving habeas claims of judicial bias.  *See Maurino*, 210 F.3d at 645; *Poland v. Stewart*, 117 F.3d 1094, 1103-04 (9th Cir. 1997).

2.    *Analysis*

As evidence of bias, petitioner points to the trial judge's handling of the video evidence issue, and to the judge's repeated and sometimes stern admonishment of defense counsel.  Neither, however, demonstrates that the judge was biased against petitioner.

43

With respect to the judge's handling of the video evidence issue, as noted above "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Petitioner has offered nothing to show that the judge's handling of the video evidence issue, even if erroneous, was based on a extrajudicial source or otherwise demonstrates bias against him.

With respect to the comments of the trial judge directed against counsel, to be sure the judge repeatedly admonished counsel, sometimes stridently so. It is equally apparent from a review of the trial transcript, however, that counsel gave as good as he got, sometimes displaying an explicit lack of respect for the court or responding in what is–even on the cold transcript–evident sarcasm. *See, e.g.*, Trial Tr., Vol. II, at 164, 187-88; Vol. III, at 35-36; Vol. IV, at 46, 47; Vol. V, at 50; Vol. VI, at 59-60. In assessing a judicial bias claim, a court must "differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality on the other hand." *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997). Here, the judge's comments to counsel "show little more than the judge's efforts to expedite the trial[] and maintain courtroom decorum." *Id.* Regardless of whether the judge's efforts were appropriate, they do not demonstrate bias against petitioner. *Liteky*, 510 U.S. at 556 ("A judge's ordinary efforts at courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune.").

Further, the judge's comments did not in any respect disparage either petitioner or his defense; rather, they were directed solely at counsel. Generally, to support relief, "[p]ersonal bias or a prejudicial attitude must be against the party, not against the attorney for the party." *United States v. Burt*, 765 F.2d 1364, 1368 (9th Cir. 1985); *see also*, *United States v. Harmon*, 21 F. Supp. 2d 642, 645 (N.D. Tex. 1998), *aff'd*, 202 F.3d 265 (5th Cir. 1999). Here, the trial judge did not disparage petitioner, suggest that his defense was incredible, or otherwise intimate any view on the merits of the case. As the Supreme Court has explained, "judicial remarks during the course of a trial that are

44

critical or disapproving of, or even hostile to, counsel . . . ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. Nor does the record reflect any personal animus toward petitioner himself or any bias on the part of the judge in favor of the prosecution. The judge's comments, regardless of their propriety, do not of themselves give rise to an appearance of partiality and do not establish that he was actually biased against petitioner, and it cannot be said that the Michigan Court of Appeals's determination to the contrary was an unreasonable application of clearly established law. *See Jones v. Luebbers*, 359 F.3d 1005, 1014-15 (8th Cir. 2004); *Allen v. Hawley*, 74 Fed. Appx. 457, 460-61 (6th Cir. 2003); *Copeland v. Walker*, 258 F. Supp. 2d 105, 136-37 (E.D.N.Y. 2003). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.    *Ineffective Assistance of Counsel*

Finally, petitioner contends that his appellate attorney rendered constitutionally ineffective assistance of counsel by failing to raise his three evidentiary claims on appeal, and for failing to raise some of the arguments that he raises here in support of his other claims. The court should conclude that petitioner is not entitled to habeas relief on this claim.

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose

of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained in this Report, all of petitioner's claims and arguments are without merit, and thus petitioner cannot show that counsel was ineffective for failing to raise them on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE
Dated: <u>3/24/08</u>

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on March 24, 2008.

                s/Eddrey Butts
                Case Manager